This Honorable Appellate Court for the 2nd Judicial District is now open. The Honorable Susan F. Hutchinson presiding. Please be seated. Your Honor, the first case on the docket this morning is 2-22-0354, the people of the state of Illinois plaintiff Appellee v. John Clemente defending her trial. Are you going on behalf of the appellate? Ms. Joanne B. Hennig Are you going on behalf of the appellate? Ms. Diane L. Hennig Are both sides ready to proceed? Before we proceed with the argument, we received a motion. It was unopposed to cite additional authority. We did not respond to you by order because of the time, but we will grant that motion and feel free to argue or comment on that case. And likewise, good morning from me as well. And we will proceed. Ms. Hennig, when you're ready, you may come forward. Good morning, Your Honors. Good morning. May it please the Court, my name is Elena Hennig, appearing on behalf of Defendant Appellant Brian Clemente. I'd like to address both reasonable doubt and ineffective assistance of counsel. First, no rational trial effect could have found Brian was proven guilty beyond a reasonable doubt. The child in this case, SC, had a rough start, born as she was, prematurely and with cocaine poisoning. Wasn't that vote, though, taken into consideration by the State's expert? Yes, Your Honor, albeit with very little detail on that point. Following this birth, fast forward two months, it's 4 a.m., and SC appears to be having a seizure. Her limbs are stiff, she's struggling to breathe, her face is blue, and there's dry blood coming from a small tear in her mouth. She's clothed in pajamas at the house, but by the time she gets to the hospital, the pajamas come off and it becomes apparent she also has bruises. No one claimed to see SC being physically abused. Infants can't talk. There was no confession, and it can be difficult even for a seasoned medical professional to know with any kind of certainty what happened or when. What was the point of your client's, not confession, but statement to Jasmine, oh, I'm so sorry, what's that for? He indicated in the video that he was apologizing for the harsh words he'd spoken to her earlier. Weren't there other opportunities to do that before this particular incident at about 4 o'clock in the morning? He actually took the two girls downstairs at about 2, and why didn't he say something then? Well, it's not clear why it wasn't spoken at that moment, but it appears that he was spending time in his father's room, which he considered kind of his sanctuary where he went to find his center, and in the course of those whatever ruminations that followed, was apparently moved to, you know, go express his love for her. You know, it was late in the night. Everyone had been drinking, so it's kind of hard to say why, you know, emotions would come up in that particular moment, but was there anything that indicated when he took the girls downstairs at about 2 o'clock or so that either girl was suffering from any sort of malady? Any crying, any gasping, any bleeding? There's no indication of that here. However, I would stress the fact that, you know, the fact that Brian and Jasmine both took the position that S.C. was fine earlier that night, it really doesn't mean much. You know, we've got an infant that was born just two months earlier prematurely with cocaine poisoning, so effectively she might still be, you know, in her third trimester of development. So what does fine mean? She's not actively having a seizure. You know, we don't know when was the last time she ate. How much did she eat? When didn't Brian say he was going to feed her, but he didn't? There was some discussion of bottles, but, you know, even if it was like, you know, for example, they came home from the store and Jasmine testified someone gave her a bottle. I'm not sure which of us, right? So you're talking about an infant whose needs are down to the minute at this stage of her life, and there's almost no information about her condition. You know, it's not just being quiet and not calling attention to herself is not necessarily a good thing. So, you know, and to that point, when in fact was the last time S.C. was anything but quiet? Well, her parents went to the store and got drunk and played Monopoly and tended to their struggling relationship. Nobody knows. So her grandfather left about to go to work, I think, between 12 and 1. Did he note anything at that particular time with her condition? He didn't testify, so that would be unclear. So you can't rely on the occurrence witnesses to assure that S.C. was actually fine earlier that night. And so you might imagine a pediatric expert could weigh in with an opinion about the timing of S.C.'s abuse or alleged abuse relative to the onset of her symptoms, but Dr. Jones never did that. She was hung up on the immediacy with which an infant, you know, who had been abused in the manner she surmised would typically pass out and be unable to cry. But if you listen to that, you know, the responding officer's video that captured his shoulder, Mike, you can hear pretty steady infant crying at multiple intervals there. So now what? When might S.C. have suffered abusive head trauma? Dr. Jones doesn't say. So setting that up. With a seizure, I mean, if she had a seizure, is a seizure going to cause that kind of head trauma? Well, there's a little bit of a potential for circularity. It's not clear whether the seizure necessarily flowed from the head trauma or the bleeding or, you know, bleeding can cause a seizure. Like, it's not always clear. In this situation, though, Dr. Jones testified that a seizure could result from head trauma. But if she had the seizure first, which could be a theory here, could that have caused the head trauma? I mean, I don't think the record's clear on that. Dr. Jones certainly takes the position that the internal injuries she's seeing require severe force and acceleration and that sort of thing. So I would suspect if she didn't say it outright, her position would have been no. But, again, coming back to the condition S.C. was in to begin with, which we know nothing about other than the fact that she didn't have a healthy birth, there's just a lot of open questions about what may or may not have triggered those seizures. So setting aside the internal injuries, you might look at S.C.'s bruises along with the tear in her mouth and think surely those show abuse occurred within the preceding two hours. But those don't either. I mean, Dr. Jones never took a stance on the age of S.C.'s bruises or her mouth injury. They could have been visible when Brian brought her downstairs and he just didn't notice. Or the bruises could have made a delayed appearance following an older injury. Isn't there, can someone, though, comment on the fact that infants, because of the nature of their skin, will bruise more quickly, the bruise will appear more quickly? I believe the testimony was along the lines of, you know, it can depend on the proximity of the bone underneath the skin to the surface. You know, for example, a shin bone would be close to the surface. But it wasn't a clear stance as to how that dynamic would affect these particular bruises. There was no testimony that, and I can tell from these bruises that probably, you know, abuse occurred in this window. That didn't happen in the testimony. But couldn't the trial judge have concluded that the mouth injury, which was actively bleeding as I understood it, circumstantially fixed the time of the injuries? My understanding from the testimony is the mouth was not actively bleeding. I mean, the first responders were saying she was bleeding from the mouth and her nose. But then when pressed about those details, it was like, well, no, it was dry. And the blood on the pajamas was dry. So we don't know when that happened. Well, we do know there was no blood on her pajamas the night before. I don't think we do know that. Based on the descriptions, I mean, something, when you're talking about the injury of a child, it would seem reasonable, and we're talking about the reasonable inferences drawn by the trial judge based on the evidence, that something like blood all over the child's pajamas would have been something that would have been noticed and testified to. So we have an absence of that. We have an absence of blood on her face. All of the things that would lead a witness to conclude there was no injury. Yeah, I mean, I don't think we're talking about overlooking it. Well, first of all, I don't think we're talking about a great quantity of blood. There's a little bit of blood. There wasn't, like, gushing blood. There's no blood on the bed. This is not like, you know, a crime scene that's dramatic. So it's pretty subtle. And we only have one occurrence witness to SC's condition who actually testified. That's Jasmine. What do we know about Jasmine? Well, she's young. She just got out of rehab, which she had not completed. She skipped taking her schizophrenia and anxiety medications that day because she was planning to drink. You know, we don't know what the lighting was like in the house. All we know is they're sitting, they're playing Monopoly for who knows how long, and we've got a baby in a bouncer in the kitchen for, I guess, hours on end who's not making any noise. I mean, it is just, oh, yeah, she's very quiet. She's fine. I mean, that to me does not provide an assurance that this is actually a fine baby. There's too many open questions, and the observers of her condition are not reliable on their face and also lack any kind of, you know, medical expertise that would give greater capacity to detect, you know. The client mentioned on two different occasions that potentially the child was injured by him accidentally or mistakenly kicking the child or stepping on the child. Yeah. And that is remarkably consistent with the bruising on the child's chest. How do we overlook that or discount the trial court's consideration of that? Well, I think it's important to note that the trial court recognized from those statements that he was not making a confession. He genuinely didn't know what happened and was put in a position in the middle of the night of trying to, like, come up with a reason why this baby is suddenly in distress. Right. That was the first statement, but the second one was substantially later when I think he was already in custody. I'm sorry. So would you mind? The second statement where I can't remember the name of the officer testifying. Oh, I'm sorry. He's just walking by and here's your client say, you know. Yeah, no, but even later. I mean, he still doesn't, and the trial court's findings bear this out, he doesn't know what happened. You know, the passage of time doesn't help in that sense because he's just struggling to piece it together. And the court even recognized this was a very manipulative interview. So it wasn't about, like, an open-ended inquiry to try to figure out where we got to this point. It's like we've already decided that something happened between 2 and 4 a.m. and, you know, we're going to get you to tell us what that was, even if that's actually not what brought about her injuries. Well, we also know that something happened before Jasmine took the girls upstairs initially to go to bed, and that was the phone call from her friend that caused some agitation, for lack of a better description, with both of them, but particularly with your client who I think answered the phone, and I would suspect spoke harshly to him. So he's angry at about 1 to 2 o'clock in the morning. And now at 4 o'clock when he calls her from the bottom of the stairs, he's concerned, but did that anger just go away? What happened? I mean, he was angry. It's quite clear he was angry. She went upstairs because of it. Yeah, but again, I mean, he was angry, but there was no testimony that he was acting out as a result of that anger. He's not, you know, physically, he's not punching walls or anything of that nature. And so he goes to his father's room to kind of chill out, and he brings his daughters with him because he's concerned that, you know, Jasmine has a tendency to be neglectful and just kind of prop up the bottle in the baby's mouth. So I think it's reasonable to say that there was a dissipation of anger, and he was just coming back around to, like, oh, this isn't where I wanted my relationship to be going, and I love this woman and that sort of thing. Because the alternative is that, you know, she, he's, according to the states theory, he's apologizing for something he's done, but then why sit down and have a little chat for 20 minutes and then be sort of thrown off and startled when, you know, S.C. makes some noise, presumably, that brings them to pay attention to her, you know, and then he gets all stressed and gets his sister to help. I mean, it just doesn't really ring true with those facts that he was actually coming up because he was like, oh, no, what did I just do to the baby? But I also wanted to mention, too, you know, we don't have any testimony from the paramedic on the subject of these external injuries. We don't have testimony from any paramedics. So the very first medical professional to lay eyes on S.C. didn't testify. And so do we really know that that bruise is from a boot heel or, for example, a chest compression or whether facial bruises even were the result of some other medical intervention in the course of, you know, intubating this very fragile child? It's not clear. And, again, that's the state's burden to fill those gaps, and they didn't do it. Well, they took the child to Loyola and intubated her there, I thought. And so there was time for people to see her before that happened, before she was intubated, and she had those bruises before she was intubated. Well, the testimony at the scene is not clear that she had bruises. It's, you know, maybe her face is puffy, it's blue, but we also know from the medical evidence that she had a lack of oxygen. And so it's not clear at all that those were bruises versus, you know, her coloration. Go ahead and finish your answer and get a wrap-up, if you would. At the end of the day, all the state really proved was that Brian had an opportunity to hurt S.C., but so did Jasmine and his father and his sister and his sister's boyfriend, whom Brian's father apparently didn't like, and anyone else who was around S.C. in the preceding 24 hours, if not more. So the fact is we don't know when she was injured, we don't know by whom, and Brian's conviction should not be allowed to stand. Perhaps in my rebuttal I can address ineffective assistance briefly and suggest a new trial would be wanted and the alternative. All right. You will have an opportunity to respond if you choose to. Thank you. Thank you. Ms. Campbell. Good morning, Your Honors. Diane Campbell representing the people of the state of Illinois this morning. There are a number of areas I want to get to. First of all, for the timeline of the injury, I examined Dr. Jones' testimony, which is at R395 in the record, and she is describing the front frenulum tear. She says that is what connects the gum to the upper lip. She said that it was torn due to trauma, and it does cause a lot of bleeding when the frenulum is torn. That's, again, at 395. So that does indeed date the child's wounds. That's a particular distinction with Kobishka, where at 43, the court notes that there are no external injuries establishing the source of the internal injuries, which were limited solely to K.H.'s brain and eyes. Here the injuries are visible, and more than just the brain bleeds, which were on both sides of her brain, according to Dr. Jones, the retinal hemorrhaging, which was the worst that Dr. Jones had ever seen. In this case, Essie is fine when she is taken downstairs, according to the defendant's own statements. As a primary caregiver for that child, he would be in the best position to know her usual disposition while that was... But isn't that really a guess, and that's counsel's, really the thrust of counsel's argument? Was this child fine at 2 a.m., at midnight, at 11 the night before? How do we know? Because the parents, again, Jasmine, at 11 when she took the babies up, said that Essie was fine. Had she been projectile vomiting, displaying fever, been restless and cranky, as some of the other infant symptoms for brain bleed or retinal hernia, had those been displayed, they would not have described her as fine. The defendant, as I said, said she was fine when he brought her downstairs. Credibility determinations are left to the trial judge, along with conflicts in the evidence and the reasonable inferences. In this case, because it was a bench trial, we had the trial judge's assessment of the credibility of that statement. And at page 6 of my brief, I quote the trial judge's comments at the motion for new trial. And he says that Brian's statement is credible because he was concerned for her at the time because he didn't trust Jasmine to take appropriate care. So he would have noticed if she were not fine when he brought her down at 2 a.m. in the morning. He also notes that Brian is able to describe exactly where on the bed he is laying, where GC is laying, and that Essie is at the bottom of the bed. She's on top of the cover, but she's wrapped in her own little blankie. So clearly he has recollection and cognizance of what's going on. So how could the defendant not notice Essie's distress at 4 a.m. in the morning when he runs upstairs to Jasmine? He did recognize her distress at 4 a.m. Exactly. That's my point. I set some of the facts at page 14 in my brief. But Jasmine says at 4 a.m. he was screaming her name. That's at 176. He started to cry, saying, so sorry, so sorry. That's at 177. It was a brief time later, not 20 minutes or whatever my opposing counsel said, when Jasmine hears the baby cry and they go downstairs. Immediately upon seeing the baby, Jasmine notices the Essie gasping for air and blood at the nose and mouth. That's at 182. Emily, who comes quickly to help with the baby, notices the baby blue and bleeding from mouth going down to the 90. That's at 108. As do the police officer at 277, who says the baby's trying to cry. She's blue and she has a bloody lip. How could the defendant, sleeping on the bed with the baby at 4 a.m., not notice those signs of Essie's distress? There's additional corroborative evidence. There's a photo of the room where they were sleeping together with a formula bottle with very little left. Jasmine said that Essie gets six ounces of formula every two to three hours. That's a record at 210. So it's a reasonable inference that defendant, in fact, did feed Essie when he had her there between 2 and 4. But he doesn't remember that necessarily, correct? He doesn't testify about it. Also, there are other corroborations because all the people at the scene at that time, Jasmine and Nellie, the police officer, state that the defendant is more concerned with Selby and Annalee's boyfriend being there than he is with Essie's condition. Certainly during his interview with the police, he keeps reiterating that he has taken care of Jasmine when she had COVID. He took care of Essie when Jasmine went for her week of rehab. He is the primary caregiver. He has staged this romantic reconciliation despite her prior infidelities to him. And in the middle of this big reconciliation scene, her boyfriend calls on the cell phone. She hands the phone. He is, in fact, incensed. He's angry. He's pissed. Actually, I think it says that he threatens the boyfriend. Shortly after that, Jasmine takes the kids upstairs at 11. She said it's due to the defendant being so angry. So he continues to drink after that point. Oh, and Essie is, in fact, fine. Clearly, defense counsel could have cross-examined Jasmine on the quality or duration of Essie's fineness, but that might be considered ineffective assistance of counsel because if you eliminate that nebulous possibility, that's to the defendant's detriment. The other corroborative evidence is G.C. is not at all hurt. She sleeps through the entire episode. There's also the crescent-shaped bruise, which your honors have noticed. The first mention of that is when the defendant says to the booking officer that he might have accidentally kicked Essie and he wants to talk to somebody. The second instance is when he is in the police interview and they show him a picture of the crescent-shaped bruise, and then he lifts his foot, displaying his footwear, and says that the heel is consistent with what the picture shows. Clearly, you know, that if you can imprint your heel mark, you know, on the baby in a bruise, it's not an accidental kick in bed. You have to stomp on the baby or step on her. So there's a conglomeration of injuries there. Well, that was the crescent-shaped bruise was interesting because the baby's on the bed. Assuming he was in the bed or getting ready to go to bed, he's got his shoes on? Clearly, you know, that is a logical inconsistency with the defendant's, you know, theory of what happened. Obviously, the court doesn't have to believe everything that the defendant says, and he is bound by the improbabilities of the story he tells. That is all a credibility determination. It's a weighing of conflicting evidence. It is a reasonable inferences, all of which are left to the trier of fact. In this case, the trial judge, who clearly explained everything in his motion to reconsider sentence. By the time the first responders got there, Jasmine was holding the baby, and maybe Annalee held her for a while. Did anybody see that child on the floor? No, no. I believe when she went in, the baby was on the bed. She was, I think, was hesitant to pick her up because she didn't want to do any further damage. I think actually she was encouraged to like to sit by the baby and make sure she doesn't fall off. That's my best recollection of what her testimony and Annalee's testimony was. What expert testimony fixes the time of injuries? Dr. Jones. As I said, she said the front frenula tear was torn due to trauma, and it causes a lot of bleeding when the frenula is torn. So if the baby had no visible injury, there's no blood visible on the nightie, on her face or nostril, when she comes downstairs at 2 o'clock, but everybody, everybody sees the baby gasping. They see the blood on the nostril. It happened between 2 and 4 when she was in the sole possession of the defendant. And he runs upstairs at 4 a.m. saying, I'm so sorry, I'm so sorry. That is tantamount to confession and indicates that he in fact is the one that inflicted these severe injuries to the baby. I'd like to briefly address some of the ineffective assistance of counsel, although I don't know what my opponent is going to say. In this case, classically, a defendant can either present an affirmative defense or he can hold the state to a burden of proof. Clearly, what they did with this guilty client, which was not unreasonable, is to hold the state to the burden of proof. Here, the baby was fine when it came down at 2. Defendant at 4 o'clock runs up saying, I'm so sorry, I'm so sorry. It's defendant's trial strategy to not call the witness. Here we know that they consulted some expert. Let's assume for the sake of argument that an expert might have helped. Just for the sake of argument. Based on this record, how do we know what an expert would have testified and therefore render a decision as to whether or not the presence of that expert might have changed the outcome? If we don't know who the expert was, what the expert would have testified to and what his or her credentials might have been. In my brief, I cite a number of cases that say that, in fact, the defendant can't prove ineffective assistance under the second prong, prejudice, because we don't know what the expert would have said. In Petrie, I believe, which I cite in my brief at 24, one of the experts testifies that they always testify for the defense. And if they can't help the defendants testify, they inform their client and they don't testify. We don't know that that's not exactly what happened here. That's my point. We don't know. Why isn't this just simply right for a post-conviction petition? Exactly. Would it be considered forfeited if it's raised on a post-conviction? I think, depending on, you know, what happens here, if this court says that the record is insufficient, I certainly think that would give the defendant very good grounds to try and raise it. But again, we don't know that the expert, if they had testified, would in fact have aided the defendant's case. There's nothing to say to explain defense counsel's strategy for not calling an expert. And that is really not a basis for ineffective assistance of counsel. Presumably, if they were trying to raise an ineffective assistance of counsel in a PC, they might be able to get some sort of affidavit from the untestifying expert or somebody else. But there's nothing in this record here that explains the clear tactical choice. He might have a better claim for ineffective assistance. Did the record not demonstrate that he in fact consulted someone? But clearly, what they have done is consult the expert to prepare to cross-examine Dr. Jones. Under the cross-examination, the defense attorney knows that a retinal hemorrhage cannot be detected by the average person. You need specific medical equipment. He talks about the front femoral tear, which it took me quite a time to learn how to say. So obviously, you know, he has prepared quite well to cross-examine the doctor. One of their areas of chief concern was whether Dr. Jones' testimony that with a severe injury, the baby would lapse into unconsciousness and not cry. And the fact that, you know, as opposing counsel noted, you can hear the baby cry on the officer's microphone. And clearly, you know, if she's gasping for air, she is probably not unconscious. But in this case, Dr. Jones clarified on redirect that she was not saying that it was 100% of the time. So... Thank you. You can finish your... Okay. Here, under the courts have rejected a reasonable hypothesis of innocence. And that is what you would have to impose if you tried to say that there wasn't sufficient evidence. Well, this is an interesting point. Opposing counsel in her brief talks about the fact that this case is closely balanced. What, well, I assume from that statement in your head, the state does not believe so, but I think you need to say it on the record so we can hear it. As briefly as I can, Jasmine said the baby was fine at 11 when she took the baby up. Defendant says that the baby is fine when he brings her down at 2 o'clock in the morning. At 4 o'clock in the morning, he runs up to Jasmine saying, I'm so sorry, I'm so sorry. When they go down briefly after that, they can visibly see the baby in dire distress. She is gasping. She is unable to breathe. She is turning blue. She has blood on her nose and mouth. Dr. Jones' testimony establishes that when the front femoral is torn, it causes bleeding. So that is not a delayed impact or unviewable injury. The defendant should indeed probably did, and that's why he ran up saying, so sorry. Notice the baby gasping, turning blue, and having blood. Clearly, this is a case where the credibility determinations, the weight to be given to the various witnesses and the evidence, and the reasonable inferences were made by the trial judge who found the defendant clearly guilty. Any other questions? Thank you. Thank you. Ms. Penick. I promised I'd get to ineffective assistance, but one quick point about reasonable doubt. Opposing counsel said, of course, Brian would have seen the blood earlier had it been present. But, in fact, there's no testimony or evidence in his statement that the lights were even on at 2 in the morning when he moved the baby. And most of the time when you're moving a sleeping baby, you're not going to flip on the lights. Jasmine testified she turned on the lights when they heard the noise. That's how they came to see the condition of her face. The doctor acknowledged bruises take time to appear. They may not have been present when he moved her, or they may not have been present even when the police showed up because we don't have paramedic testimony. And the remaining injuries are internal. And what do we know about, you know, brain bleeds and retinal bleeds? They hide. Conditions that have the potential to trigger seizures, internal conditions such as being born prematurely with cocaine poisoning, those things hide. And so it's so tempting to assume that the last adult in the room before a baby, you know, shows overt signs of distress must be at fault because we want someone to blame. But the evidence here just doesn't bear that out as a reliable conclusion. Well, if this baby is that sick, and this is a position you're making several times, you know, her premature birth and the cocaine poisoning, why is she home with these two people who obviously drink and possibly use, well, we know mom does and we don't know about dad, but why is she home with these people? I mean, that's not for us to say. It's the state's burden to present enough information to conclusively show only this person had the opportunity to hurt this individual. And they haven't done that. And part of that is based on all the holes in the evidence about her condition. And it's not just about, you know, her own fragility or issues at birth. When you look at other cases dealing with shaken babies, there's a lot more detail typically about, like, she only had a three-ounce bottle and she was a little bit, you know, she had some reflux or, like, there's details. There's no details here. And that falls on the state. If I may quickly, if this court does not reverse outright, it should at least send his case back for a new trial. Defense counsel was zealous in some areas, but clearly did not call an expert witness. And, yes, we know that there was some consultation with an expert. But at the very least, an expert, whatever their thoughts are on the medical findings in this particular case, an expert could have alerted the judge to the controversy surrounding. I want to cut right to the chase. We have no idea what a potential expert would have testified to. Tell me how we can decide whether or not you meet the second problem. Well, if you look at Petrie, for example, what defense counsel failed to do in that case was cross-examine the state's expert about the foundation for the conclusion that, you know, there would be no lucid interval. And this court was willing to look at outside resources, journals and other cases that have referenced the unreliability of shaken baby findings and said at least alert the fact finder to a controversy on this point. Yes, we know there's going to be some experts who say lucid intervals are possible and some say they're not. The length of the... Wasn't there very poor cross-examination in Petrie as well? Yes. I mean, the cross-examiner was what was defective there. But the larger point is that you can alert by means of another expert, alert the fact finder to the existence of a controversy when this court is willing to acknowledge that controversy exists. And other courts have done so as well. Maybe they could not find an expert that would do this alert. I mean, I think you don't have to get into the particulars of this case in order to have an expert weigh in on that. And just Petrie and other cases show there are, in fact, experts who can hold forth on these issues, the fact that there is this controversy. But it would sound like Dr. Jones, she used the language, I think, in her testimony, shaken baby. So we, I think, can presume that she did believe that there was this phenomenon that is at issue here. She did, but there's other, there's more to the story that she didn't bring forth. I mean, you know, shaken baby syndrome is not grounded in objective science. It's a hypothesis that was advanced to explain, you know, findings that were not well understood. And that happened decades ago, and we still don't know that that's a reliable conclusion. That is the state of the research on those matters. It's not fully understood. So an expert could have spoken, regardless of his or her opinion on this case, an expert could have at least alerted the judge to the controversy about the mechanism of injury alleged here and the timing, which was so critical, and also provide information about other medical conditions that can mimic non-accidental injury, which would include congenital defects and complications of premature birth. Without this information, Brian's trial was not a reliable process, and I think Petrie provides a good roadmap as far as, like, this can be resolved on direct appeal. It's not always necessary to hold it for a PC. Justice Gergen? I have no other questions. Thank you. Thank you. Okay. Thank you, Your Honors, and we would ask that you reverse outright or send this case back for a new trial. Thank you. Thank you. Thank you, Counsel. Thank you, Counsel, for your arguments this morning. We will take this matter under advisement. We will make a decision in due course.